RECORD NO. 15-1999

In The

# United States Court of Appeals

### For The Fourth Circuit

# BRANDON PEGG,

*Plaintiff – Appellee*,

## v.

# GRANT HERRNBERGER, individually and in his capacity as agent and employee of the West Virginia State Police,

*Defendant – Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING

_____

### BRIEF OF APPELLANT

_____

**Deva A. Solomon**
**Monte L. Williams**
**Robert L. Bailey** (*on brief*)
STEPTOE & JOHNSON, PLLC
**1085 Van Voorhis Road**
**Post Office Box 1616**
**Morgantown, West Virginia  26507**
**(304) 598-5365**

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1999__    Caption: _Brandon Pegg v. Grant Herrnberger_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Grant Herrnberger_____
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☑YES ☐NO
        If yes, identify entity and nature of interest:

   National Union Fire Insurance Company of Pittsburgh, Pa. - insurer

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Deva A. Solomon_____       Date: _____9/10/15_____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____9/10/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_/s/ Deva A. Solomon_____                  _____9/10/15_____
      (signature)                                        (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

I. JURISDICTIONAL STATEMENT ................................................1

II. STATEMENT OF THE ISSUES .....................................................1

III. STATEMENT OF THE CASE .........................................................2

    A. Factual background. .............................................................2

    B. Procedural background...................................................10

IV. SUMMARY OF THE ARGUMENT ............................................14

V. ARGUMENT...................................................................................17

    A. The governing standard on appeal ...................................17

    B. Qualified immunity ..........................................................17

    C. Trooper Herrnberger is entitled to qualified immunity from Pegg's Fourth Amendment unlawful arrest claim ..............................20

        1. Trooper Herrnberger had the authority to order Pegg from his vehicle........................................................22

        2. Trooper Herrnberger had the authority to search Pegg incident to Pegg's arrest for his conceded violation of W. VA. CODE § 17C-16-9 .......................................23

        3. Trooper Herrnberger had the authority to pat Pegg down under *Terry*............................................................27

        4. Summary .................................................................36

i

D.    Trooper Herrnberger is entitled to qualified immunity from Pegg's First Amendment unlawful arrest claim...................................38

E.    Trooper Herrnberger is entitled to qualified immunity from Pegg's Fourth Amendment excessive force claim ............................40

F.    Trooper Herrnberger is entitled to qualified immunity from Pegg's state-law outrage claim...........................................................46

G.    Trooper Herrnberger is entitled to qualified immunity from Pegg's state-law battery claim...........................................................49

VI.    CONCLUSION.........................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott v. Sangamon County, Ill.*,
  705 F.3d 706 (7th Cir. 2013) ........................................................................25

*Abney v. Coe*,
  493 F.3d 412 (4th Cir. 2007) ........................................................................42

*Am. Civil Liberties Union of Md., Inc. v. Wicomico County, Md.*,
  999 F.2d 780 (4th Cir. 1993) ..........................................................................1

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ......................................................................................19

*Argueta v. City of Revere*,
  No. 09-CV-10268, 2009 WL 5218073 (D. Mass. Dec. 31, 2009) ...............29

*Atwater v. City of Lago Vista*,
  532 U.S. 318 (2001) ..........................................................................23, 24, 26

*Britt v. Peoria County*,
  No. 11-1034, 2013 WL 474377 (C.D. Ill. Feb. 7, 2013) ..............................28

*Clark v. Link*,
  855 F.2d 156 (4th Cir. 1988) ........................................................................11

*Cooper v. California*,
  386 U.S. 58 (1967) ........................................................................................26

*Devenpeck v. Alford*,
  543 U.S. 146 (2004) ................................................................................21, 25

*Elliott v. Leavitt*,
  99 F.3d 640 (4th Cir. 1996) ..........................................................................42

*Ezell v. Franklin County Children Servs.*,
    No. CV08-02258, 2008 WL 2852247 (C.D. Cal. July 23, 2008) ................11

*Figg v. Schroeder*,
    312 F.3d 625 (4th Cir. 2002) .......................................................................50

*George v. Rehiel*,
    738 F.3d 562 (3d Cir. 2013) ........................................................................32

*Gozlon-Peretz v. United States*,
    498 U.S. 395 (1991).....................................................................................35

*Gooden v. Howard County, Md.*,
    954 F.2d 960 (4th Cir. 1992) (en banc) .......................................................42

*Graham v. Connor*,
    490 U.S. 386 (1989).............................................................................*passim*

*Gregory v. Burnett*,
    577 F. App'x 512 (6th Cir. 2014)................................................................26

*Groh v. Ramirez*,
    540 U.S. 551 (2004).....................................................................................20

*Groman v. Township of Manalapan*,
    47 F.3d 628 (3d Cir. 1995) .........................................................................49

*Haring v. Prosise*,
    462 U.S. 306 (1983).....................................................................................20

*Harless v. First Nat'l Bank in Fairmont*,
    169 W. Va. 673, 289 S.E.2d 692 (1982) ......................................................47

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)................................................................................17, 18

*Haynes v. Anderson & Strudwick, Inc.*,
    508 F. Supp. 1303 (E.D. Va. 1981) .............................................................11

*Henry v. Purnell*,
   652 F.3d 524 (4th Cir. 2011) .........................................................................42

*Hunter v. Bryant*,
   502 U.S. 224 (1991).........................................................................17, 18, 50

*Illinois v. Wardlow*,
   528 U.S. 119 (2000).........................................................................27, 28, 29

*In re State of N.Y.*,
   256 U.S. 490 (1921).........................................................................................13

*Jaegly v. Couch*,
   439 F.3d 149 (2d Cir. 2006) .........................................................................25

*Johnson v. City of Fayetteville*,
   No. 5:12-CV-456-F, 2015 WL 928772 (E.D.N.C. Mar. 4, 2015)................25

*Jones v. Buchanan*,
   325 F.3d 520 (4th Cir. 2003) .........................................................................43

*Keaton v. Hannum*,
   No. 1:12-CV-00641, 2014 WL 941352 (S.D. Ind. Mar. 11, 2014)..............39

*Kentucky v. Graham*,
   473 U.S. 159 (1985).........................................................................................11

*Keyes v. Keyes*,
   182 W. Va. 802, 392 S.E.2d 693 (1990) .......................................................48

*Lawyer v. City of Council Bluffs, Iowa*,
   240 F. Supp. 2d 941 (S.D. Iowa 2002), *aff'd*,
   361 F.3d 1099 (8th Cir. 2004) .......................................................................49

*Maciariello v. Sumner*,
   973 F.2d 295 (4th Cir. 1992) .........................................................................17

*Malley v. Briggs*,
   475 U.S. 335 (1986).........................................................................17, 50

*Maryland v. Garrison*,
    480 U.S. 79 (1987)...........................................................................42

*Maryland v. Wilson*,
    519 U.S. 408 (1997).........................................................................22

*Melgar ex rel. Melgar v. Greene*,
    593 F.3d 348 (4th Cir. 2010) ..................................................17, 50

*Miller v. Parrish*,
    No. 3:12-CV-873, 2013 WL 1868028 (E.D. Va. May 2, 2013) ..................46

*Milstead v. Kibler*,
    243 F.3d 157 (4th Cir. 2001), ..................................................18, 19

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985).............................................................................1

*Monell v. Dep't of Social Servs. of City of New York*,
    436 U.S. 658 (1978).........................................................................13

*Park v. Shiflett*,
    250 F.3d 843 (4th Cir. 2001) .........................................................42

*Pearson v. Callahan*,
    555 U.S. 223 (2009)...........................................................18, 19, 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984).............................................................................13

*Pennsylvania v. Mimms*,
    434 U.S. 106 (1977).....................................................................22, 36

*Pepiton v. City of Farrell, Pa.*,
    No. 05-CV-0573, 2005 WL 2647953 (W.D. Pa. Oct. 17, 2005) ..................23

*Rawlings v. Kentucky*,
    448 U.S. 98 (1980).............................................................................24

*Raygor v. Regents of Univ. of Minn.*,
    534 U.S. 533 (2002)...................................................................................13

*Reichle v. Howards*,
    132 S. Ct. 2088 (2012)........................................................................38, 39

*Reid v. Georgia*,
    448 U.S. 438 (1980)...................................................................................31

*Rowland v. Perry*,
    41 F.3d 167 (4th Cir. 1994) ..................................................................44, 45

*Saucier v. Katz*,
    533 U.S. 194 (2001)............................................................................18, 19

*Scott v. Harris*,
    550 U.S. 372 (2007)...................................................................................41

*Sigman v. Town of Chapel Hill*,
    161 F.3d 782 (4th Cir. 1998) ........................................................................42

*Slattery v. Rizzo*,
    939 F.2d 213 (4th Cir. 1991) ......................................................................18

*Slider v. State Farm Mut. Auto. Ins. Co.*,
    210 W. Va. 476, 557 S.E.2d 883 (2001) ......................................................20

*State v. Chase Sec., Inc.*,
    188 W. Va. 356, 424 S.E.2d 591 (1992) ......................................................46

*State v. Olivetti*,
    107 W. Va. 357, 148 S.E. 205 (1929) ..........................................................26

*Street v. Surdyka*,
    492 F.2d 368 (4th Cir. 1974) ......................................................................11

*Tanner v. Rite Aid of W. Va., Inc.*,
    194 W. Va. 643, 461 S.E.2d 149 (1995) ................................................47, 48

*Terry v. Ohio*,
    392 U.S. 1 (1968)..................................................................*passim*

*Tobey v. Jones*,
    706 F.3d 379 (4th Cir. 2013) ......................................................39

*Travis v. Alcon Labs., Inc.*,
    202 W. Va. 369, 504 S.E.2d 419 (1998) ................................47, 48

*United States v. Arvizu*,
    534 U.S. 266 (2002)....................................................................31

*United States v. Branch*,
    537 F.3d 328 (4th Cir. 2008) ......................................................35

*United States v. Brown*,
    21 F.3d 425 (4th Cir. 1994) (mem.) ...........................................30

*United States v. George*,
    732 F.3d 296 (4th Cir. 2013) ......................................................27

*United States v. Lender*,
    985 F.2d 151 (4th Cir. 1993) ......................................................27

*United States v. Miller*,
    925 F.2d 695 (4th Cir. 1991) ......................................................24

*United States v. Oliver*,
    550 F.3d 734 (8th Cir. 2008) ......................................................29

*United States v. Perkins*,
    363 F.3d 317 (4th Cir. 2004) ......................................................35

*United States v. Robinson*,
    414 U.S. 218 (1973).....................................................................23

*United States v. Simpson*,
    609 F.3d 1140 (10th Cir. 2010) ..................................................29

*United States v. Sokolow*,
    490 U.S. 1 (1989).........................................................................................31

*United States v. Stanfield*,
    109 F.3d 976 (4th Cir. 1997) .....................................................................22

*United States v. Swindle*,
    407 F.3d 562 (2d Cir. 2005) .........................................................................3

*United States v. Toranzo*,
    No. 207-CR-38, 2007 WL 1341048 (N.D. Ind. May 4, 2007).....................30

*United States v. Vaughan*,
    700 F.3d 705 (4th Cir. 2012) .....................................................................29

*United States v. Walker*,
    555 F.3d 716 (8th Cir. 2009) .....................................................................28

*United States v. Walker*,
    960 F.2d 409 (5th Cir. 1992) .....................................................................26

*United States v. Wen Bin Chen*,
    811 F. Supp. 2d 1193 (M.D.N.C. 2011)......................................................24

*United States v. Whitehead*,
    849 F.2d 849 (4th Cir. 1988) .....................................................................35

*Vathekan v. Prince George's County, Md.*,
    154 F.3d 173 (4th Cir. 1998) .....................................................................41

*Whitesell v. Town of Morrisville*,
    446 F. Supp. 2d 419 (E.D.N.C. 2006) ........................................................11

*Whren v. United States*,
    517 U.S. 806 (1996)...................................................................................25

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989)...................................................................13

*Wilson v. Layne*,
    526 U.S. 603 (1999)..................................................................40

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I...............................................................*passim*

U.S. CONST. amend. IV..............................................................*passim*

U.S. CONST. amend. XI..................................................................13

U.S. CONST. amend. XIV.................................................................11

W. VA. CONST. art. III, § 6.............................................................11

W. VA. CONST. art. VI, § 35.............................................................13

## STATUTES

28 U.S.C. § 1291..........................................................................1

28 U.S.C. § 1367.........................................................................13

28 U.S.C. § 1738.........................................................................20

42 U.S.C. § 1983.............................................................11, 12, 13, 20

W. VA. CODE § 15-2-12..................................................................26

W. VA. CODE § 17C-16-2.................................................................2

W. VA. CODE § 17C-16-9............................................................*passim*

W. VA. CODE § 61-2-10b............................................................*passim*

W. VA. CODE § 61-5-17.............................................................*passim*

## OTHER AUTHORITIES

RESTATEMENT (SECOND) TORTS § 46 ........................................................................48

RESTATEMENT (SECOND) TORTS § 118 ......................................................................49

RESTATEMENT (SECOND) TORTS § 132 ......................................................................49

## I.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.[1]  The instant appeal is taken from a final order issued by the United States District Court for the Northern District of West Virginia on August 31, 2015, and the Notice of Appeal was filed on September 1, 2015.[2]  Pursuant to this Court's Order of September 16, 2015, the opening brief and joint appendix are due on October 26, 2015, and are filed timely.

## II.    STATEMENT OF THE ISSUES

(1)    Whether the district court erred in denying Trooper Herrnberger qualified immunity from Brandon Pegg's Fourth Amendment false arrest claim.

(2)    Whether the district court erred in denying Trooper Herrnberger qualified immunity from Pegg's First Amendment false arrest claim.

(3)    Whether the district court erred in denying Trooper Herrnberger qualified immunity from Pegg's Fourth Amendment excessive force claim.

(4)    Whether the district court erred in denying Trooper Herrnberger qualified immunity from Pegg's state-law outrage claim.

(5)    Whether the district court erred in denying Trooper Herrnberger qualified immunity from Pegg's state-law battery claim.

---

[1]    *See Am. Civil Liberties Union of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 784 (4th Cir. 1993) ("A district court's denial of qualified immunity on a motion for summary judgment is an immediately appealable final order under 28 U.S.C. § 1291.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).").

[2]    (J.A. at 387.)

1

## III.    STATEMENT OF THE CASE

### A.    Factual background.

On August 4, 2013, West Virginia State Police Trooper William Beck ("Trooper Beck") and West Virginia State Police Trooper Grant Herrnberger ("Trooper Herrnberger") (together, "the Troopers") were on road patrol on Big Wheeling Creek Road in rural Marshall County, West Virginia.[3] They had stopped to investigate an abandoned vehicle when Appellee, Brandon Pegg, drove by.[4] The Troopers noticed—and it is undisputed—that Pegg was operating his vehicle with an expired motor vehicle inspection sticker (it had expired the previous April, more than three months earlier[5]), which is illegal.[6] Pegg drove by the Troopers slowly,[7] and the windows of his vehicle were rolled down,[8] so one of the Troopers audibly commanded to Pegg to pull over.[9]

---

[3]     (JA at 25–26, 58–59, 9 ¶ 4.)

[4]     (JA at 58–59, 75–76, 9 ¶ 4.)

[5]     (JA at 101 (Pl.'s Resp. to Def.'s RFA #1) (admitting that he was operating vehicle with expired inspection);  JA at 78 ("Q: . . . [D]o you agree with me that, yes, in fact, your sticker was—was expired on that date?  A: Yes.  Q: And so do you agree with me that having an expired inspection sticker gives . . . Troopers Beck and Herrnberger, a valid reason to pull you over? A: Yes.").)

[6]     *See* W. VA. CODE § 17C-16-9.

[7]     (*See* JA at 59)

[8]     (*See* JA at 106.)

[9]     (JA at 27–29, 58–61.)  *See also* W. VA. CODE § 17C-16-2(a) (West Virginia troopers "may at any time upon reasonable cause to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper

Pegg, however, failed to stop, so Trooper Beck suggested that they pursue and stop Pegg to investigate.[10] Trooper Beck drove.[11] It took the Troopers a while to catch up to Pegg, which, based on their experience, they believed meant that Pegg had, for some reason, attempted to put some distance between him and them after not stopping in response to their initial command.[12]

When the Troopers finally caught up to Pegg, they activated their cruiser's emergency lights, requiring him to pull over.[13] As the Video shows, Pegg had several opportunities to immediately pull over after the Troopers activated their blue lights, but he again failed to do so.[14] Instead, not until about *forty-five*

---

adjustment or repair, require the driver of such vehicle to stop and submit such vehicle to an inspection and such test . . . as may be appropriate").

[10]    (JA at 30, 58–59.)

[11]    (JA at 26.)

[12]    (JA at 51–52.)

[13]    (JA at 31, 9 ¶ 5.)  *See United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) ("We agree that any reasonable driver would understand a flashing police light to be an order to pull over . . . .").  The cruiser was equipped with a camera, a microphone inside the cruiser, and a wireless microphone that an officer wears. The system is designed such that when the cruiser's lights are activated, it starts recording from around thirty seconds before light activation.  (JA at 31.)  Thus, a recording of the incident starting about one minute before the Troopers activated Trooper Beck's cruiser's emergency lights is available.  (*See* JA at 20 (slip sheet for the in-car video ("Video") provided as a physical exhibit).)  Only audio from the in-car microphone is available, however, due to the failure of Trooper Beck's wireless microphone (JA at 65) and Trooper Herrnberger's microphone's lack of interoperability with the system in Trooper Beck's cruiser (JA at 54).

[14]    (JA at 51, 62–63.)

*seconds* later did Pegg finally pull over.[15]  While they were trying to get Pegg to stop, the Troopers also noticed that Pegg's vehicle bore a sticker in the rear window displaying a large picture of an AR15 automatic weapon accompanied by the challenge, "Come and take it."[16]  Although such a sticker might not *necessarily* mean that the occupants are armed, as Trooper Herrnberger explained, "it still raises the hair on the back of your neck a little bit."[17]

When Pegg finally pulled over, the Troopers realized that he was not alone, so Trooper Beck approached the driver's side of Pegg's vehicle, and Trooper Herrnberger approached the passenger's side.[18]  Beck asked Pegg for his information, which Pegg produced,[19] and Beck took the information back to his cruiser to verify it.[20]

While that was taking place, Trooper Herrnberger spoke with Pegg's passenger, Robert Beever.  Trooper Herrnberger immediately noticed that Beever was acting strangely.  His lip was quivering, for example,[21] and Herrnberger testified that based on his experience as a police officer, he felt that Beever was

---

[15]    (JA at 53.)

[16]    (JA at 30, 38–39, 47–48, 85–86.)

[17]    (JA at 51.)

[18]    (JA at 20, 32, 64, 81–82.)

[19]    (JA at 9 ¶ 6, 79–80.)

[20]    (JA at 37, 65–66, 68–69.)

[21]    (JA at 39.)

4

nervous.[22]  He was right.[23]  Trooper Herrnberger asked Beever where he and Pegg were going, but oddly Beever claimed to not know, saying only, "I'm not sure. He's driving."[24]  Given Beever's suspicious behavior and the other circumstances, Trooper Herrnberger asked Beever for his identification.

Pegg, however (who was still sitting behind the wheel of the vehicle), demanded to know why Trooper Herrnberger had asked Beever for his identification.[25]  According to Trooper Herrnberger, this, too, is unusual conduct from a law-abiding citizen on a traffic stop.[26]  Trooper Herrnberger advised Pegg to keep to himself and attempted to continue with the investigation.[27]  Pegg, however, became agitated by Herrnberger's efforts to do his job.  Herrnberger testified that he believed that Pegg's body language indicated that Pegg was "irate or upset";[28]  Pegg's friend, Beever, agreed.[29]

---

[22]    (JA at 33.)

[23]    (*See* JA at 107 ("Q: Were you nervous?  A: Yes.").)

[24]    (JA at 34, 107;  *compare* JA at 83.)

[25]    (JA at 35 ("Mr. Pegg kind of turned and was looking at us and he said something to the effect of, Why do you need to know?  Or, Why does he have to give you his ID?"), 108, 84;  *cf.* JA 9 ¶ 7.)

[26]    (JA at 40.)

[27]    (JA at 35–36, 108.)

[28]    (JA at 36.)

[29]    (*See* JA at 108–10 (calling Pegg's resultant demeanor "frustrated" and "agitated . . . [m]ost likely";  when asked "from what you could see, did he appear to be agitated or angry?", answering, "Yes. Yes.").)

Then Trooper Herrnberger saw something that all police officers dread:  Pegg reached between his legs and appeared to be trying to retrieve a dark object, which Trooper Herrnberger could not clearly see.[30]  *Later*, it would come to be believed that this object was possibly Pegg's wallet.  Trooper Herrnberger, however, did not know that at the time.  So he wisely decided not to wait for things to escalate or become violent.

Although as explained later he did not need reasonable suspicion to do so, Trooper Herrnberger testified that—understandably—his "suspicion level had risen" given the totality of the circumstances,[31] including:  (1) his belief that Pegg had been attempting to elude them from the outset of their encounter (*i.e.*, their belief under that the circumstances Pegg *had* heard their instruction to stop for the inspection sticker violation, his failure to do so, and that they felt that it took them longer to catch up to Pegg than it should have had he not been trying to distance himself from them);  (2) Pegg's failure to immediately stop after they activated the cruiser's blue lights;  (3) the sticker in the window of Pegg's truck bearing a picture of an automatic weapon and a challenge to "[c]ome and take it";  (4) Pegg's passenger's nervous conduct and inability (or possibly refusal, as far as they knew) to tell them where he and Pegg were going;  (5) after telling Pegg to stop

---

[30]     (JA at 36.)

[31]     (JA at 36, 38.)

6

interfering with Herrnberger's investigation of Beever, Pegg's negative reaction; and (6) Pegg's doing what Trooper Herrnberger reasonably feared might have been reaching for a weapon.[32]  As Herrnberger testified repeatedly, "It was the totality of all those events" that led to his decision to perform a pat down.[33]

So Trooper Herrnberger asked Pegg to exit the truck, which Pegg did.[34]  Herrnberger then attempted to conduct what would have been a few-seconds-long pat-down of Pegg for weapons.  Trooper Herrnberger demonstrated how Pegg was to turn around and place his hands together.[35]  And it initially appeared that Pegg would comply, as he put his left arm behind his back.

As the video shows, however, when Trooper Herrnberger attempted to secure Pegg's other arm, he tensed up that arm, twisted his body, and physically tried to break away from Trooper Herrnberger.[36]  The result of what *Pegg admits*

---

[32]     (JA at 41; *see also* JA at 37 (Trooper Herrnberger noting that he went around rear of Pegg's vehicle in part because he was concerned that Pegg might try to harm him by using vehicle as weapon, and he believed that this would be more difficult for Pegg to accomplish than if he went around driver's side via front of vehicle).)

[33]     (JA at 40.)

[34]     (JA at 20, 9–10 ¶ 8, 41–42, 67, 86–87.)

[35]     (JA at 20, 43–44, 67, 70, 87–88, 96–97.)

[36]     (JA at 20, 45–47, 49–50, 70.)

*was resisting*[37] was both predictable and lawful:  Trooper Herrnberger (and, a moment later, Trooper Beck, who already believed "that there was something suspicious going" on in the vehicle, saw what had started, and came to Herrnberger's aid[38]) took Pegg to the ground, handcuffed him, and stood him right back up.[39]

The video shows that the scuffle lasted less then fifteen seconds.[40] Pegg concedes that he was not punched or kicked or even yelled at, only held down.[41]  Pegg spent a total of less then forty seconds off his feet,[42] and he sustained only the minor scrapes that one might expect to sustain from such a brief encounter,[43] which he self-medicated with "[p]eroxide and Neosporin."[44]  Pegg does not fault anything that happened after he stood back up.[45]

---

[37]    (JA at 103 (Pl.'s Resp. to Def.'s RFA #6: "**Request**: Admit that you resisted Trooper Herrnberger's attempt to secure your hands behind your back.  **Response:** Admitted.");  *see also* JA at 131–33.)

[38]    (JA at 20, 71.)

[39]    (JA at 20.)

[40]    (JA at 20 from 3:35 to 3:50.)

[41]    (*See, e.g.*, JA at 89.)

[42]    (JA at 20 from 3:35 to 4:13.)

[43]    (*See, e.g.*, JA at 92–93 (no injury other than scrapes to forehead);  JA at 103 (Pl.'s Resp. to Def.'s RFA #9 (admitting he sought no medical treatment)).)

[44]    (JA at 93;  *see also* JA at 95 (Pegg sought no medical care).)

[45]    (*See* JA at 90.)

Trooper Herrnberger also had Beever put his hands up and get out of the truck, and—just like he had tried to do with Mr. Pegg—he quickly patted down Beever.[46]   Unlike Pegg, however, Beever fully cooperated, so his very brief encounter with the officers was consequently uneventful.[47]

Thanks to Pegg's misconduct, what would have been a moments-long traffic stop turned into Pegg's custodial arrest and detention for a couple of hours.[48]   Trooper Herrnberger arrested Pegg for driving with an expired motor vehicle inspection arising out of his doing so (which Pegg does not deny),[49] and for the obstruction of[50] and assault on[51] a police officer *arising out of Pegg's physically pulling away from Trooper Herrnberger as he was trying to pat Pegg down*.[52]

---

[46]     (JA at 111.)

[47]     (JA at 111.)

[48]     (JA at 10 ¶ 10;  *see also* JA at 141–42, 143–47.)

[49]     *See* W. VA. CODE § 17C-16-9.

[50]     *See* W. VA. CODE § 61-5-17(a) ("A person who by threats, menaces, acts or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer, probation officer or parole officer acting in his or her official capacity is guilty of a misdemeanor . . . .").

[51]     *See* W. VA. CODE § 61-2-10b(e) ("Any person who unlawfully attempts to commit a violent injury to the person of a government representative . . . acting in his or her official capacity, or unlawfully commits an act which places that person acting in his . . . official capacity in reasonable apprehension of immediately receiving a violent injury, is guilty of a misdemeanor . . . .").

[52]     (JA at 143–47 (West Virginia State Police Complaint Report);  JA at 311–17 (Criminal Complaint and Complaint Report).)

9

The undisputed documentary evidence is crystal clear—and (as will be explained later) it is *absolutely critical* to understand—that Trooper Herrnberger *never* arrested or otherwise charged Pegg for obstructing *arising out of Pegg's questioning Trooper Herrnberger in the vehicle*. Trooper Herrnberger arrested Pegg only for obstruction arising out of *Pegg's pulling away from Trooper Herrnberger during what was to be a brief pat-down*. To be clear, even if subjective intent were ever relevant to the analysis of § 1983 claims like Pegg made here, this is not a question of Trooper Herrnberger's subjective "motivation" for arresting Pegg. It is a simple question of understanding what conduct objectively justified Pegg's arrest.

Although the magistrate did not find probable cause on the assault charge, he did find probable cause on the expired inspection sticker charge and the obstruction charge.[53] For reasons of his own irrelevant to this appeal, the county's assistant prosecuting attorney ultimately decided not to pursue either charge.[54]

## B.    Procedural background.

On September 2, 2014, Pegg sued Trooper Herrnberger in his individual capacity, and the State of West Virginia (as Trooper Herrnberger in his

---

[53]    (JA at 311–17.)

[54]    (JA at 11 ¶ 16.)

official capacity[55]).[56]  The first claim[57] is styled "unlawful arrest" under 42 U.S.C.

§ 1983 and contains causes of action based on the First and Fourth Amendments.[58]

As for the First Amendment, Pegg claims that Trooper Herrnberger

was subjectively motivated to arrest him in retaliation for his questioning Trooper

Herrnberger's asking for Beever's identification.  As for the Fourth Amendment,

although Pegg does not dispute the legality of his arrest for violating W. VA. CODE

---

[55]     *See Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985).

[56]     (*See generally* JA at 8–16 (Compl.).)

[57]     Pegg did not number his counts.

[58]     (JA at 12 ¶ 22.)  Paragraph 22 is one massive run-on sentence that alleges at least a dozen separate causes of action.  *But see Ezell v. Franklin County Children Servs.*, No. CV08-02258, 2008 WL 2852247, at *2 (C.D. Cal. July 23, 2008) ("The preferred practice of pleading is to state various claims for relief in separate counts. Thus, for example, *in a civil rights action, each alleged constitutional deprivation should be pled as a separate claim.  The purpose of this requirement is to clarify the issues that will be addressed in the ensuing litigation.  Grouping different claims together results in muddled pleadings and places the unnecessary burden on the Court and the defendants to decipher which facts support which claims.*") (emphasis added) (citations omitted); *Haynes v. Anderson & Strudwick, Inc.*, 508 F. Supp. 1303, 1307 (E.D. Va. 1981) ("The preferred practice of pleading is to state various claims for relief in separate counts.  Otherwise, the onus, as in this case, is on the court to decipher which facts support which claims, as well as to determine whether plaintiffs are entitled to the relief sought.  This type of pleading does a disservice to the court . . . .") (citations omitted).  It cites three amendments to the United States Constitution (U.S. CONST. amends. I, IV, and XIV) and a section of West Virginia's Constitution (W. VA. CONST. art. III, § 6), even though it is well-settled that a violation of a state's constitution cannot make out a 42 U.S.C. § 1983 claim.  *See, e.g.*, *Whitesell v. Town of Morrisville*, 446 F. Supp. 2d 419, 424 (E.D.N.C. 2006) (recognizing that § 1983 "is not a vehicle that can be used to vindicate rights under a state constitution") (citing *Clark v. Link*, 855 F.2d 156 (4th Cir. 1988); *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974)).

11

§ 17C-16-9 (he concedes that he was violating that law[59]), he nevertheless claims that to the extent that he was also arrested for violating § 61-2-10b(e) and § 61-5-17(a), the arrest was unconstitutional.[60]  Pegg's argument is that Trooper Herrnberger's ordering him from his vehicle and attempting to search him was unlawful, so he was free to resist that search, so his admitted physical resistance was not obstruction or assault, so his arrest on those two charges lacked probable cause and was therefore an unreasonable, and thereby unconstitutional, seizure.[61]

Pegg next claims excessive force under 42 U.S.C. § 1983.[62]  His second claim is practically identical to his first,[63] but alleges that in taking Pegg to

---

[59]    (*See, e.g.*, *supra* at 2 n.5.)

[60]    (JA at 12 ¶ 22.)

[61]    The district court erroneously stated that Trooper Herrnberger "does not mention those charges in his" motion or reply.  (JA at 374–75.)  That is incorrect. Pegg's argument that his arrest lacked probable cause hinges on the predicate that Trooper Herrnberger's attempt to pat him down was unlawful, so Trooper Herrnberger first noted that he understood Pegg's unlawful arrest claim "to set out a claim for an unreasonable search and seizure in violation of the Fourth Amendment arising out of Trooper Herrnberger's trying to pat Pegg down for weapons" (JA at 154;  *compare* JA at 12 ¶ 22 (claiming that Trooper Herrnberger violated his "right to be free from unreasonable searches and seizures")) and then immediately went on to discuss the only issue relevant to Pegg's unlawful arrest claim:  *i.e.*, that Trooper Herrnberger's attempt to pat Pegg down *was* lawful, so it was *neither* independently unconstitutional (a claim that Trooper Herrnberger believed Pegg might also be making) *and* Pegg was thus *not* free to physically resist it (and thus that Pegg's arrest for resisting and assault was also perfectly constitutional).

[62]    (*See* JA at 13.)

[63]    (*Compare* JA at 12 ¶ 22 *with* JA at 13 ¶ 25.)

the ground when he pulled away from Trooper Herrnberger and got a few scrapes, Trooper Herrnberger "used excessive and unnecessarily brutal force on the person of Mr. Pegg . . . ."[64]   The third claim is a West Virginia common-law claim for outrage based on Pegg's allegation that Trooper Herrnberger "bullied" him.[65]   And the fourth claim alleges a West Virginia common-law claim for battery.[66]

Because sovereign immunity[67] and § 1983[68] bar Pegg's claims against the State of West Virginia, and because he has qualified immunity from Pegg's claims against him individually, Trooper Herrnberger timely moved for summary judgment.   The district court granted Trooper Herrnberger's official-capacity motion, and neither party appeals that result here.   But the court denied Trooper Herrnberger's individual-capacity qualified immunity motion for summary judgment.   As demonstrated herein, that denial was erroneous.

---

[64]    (JA at 13 ¶ 25.)

[65]    (JA at 14 ¶¶ 27–29.)

[66]    (JA at 14–15 ¶¶ 30-32.)   Pegg also sued for false imprisonment (JA at 15 ¶¶ 33–34), but he dismissed that claim in response to Trooper Herrnberger's motion to dismiss (JA at 367).

[67]    *See In re State of N.Y.*, 256 U.S. 490, 497 (1921);   *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984);   U.S. CONST. amend. XI;   *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42 (2002) (holding that 28 U.S.C. § 1367 does not change this).   Even if Pegg had filed his state claims in state court, they would still lack merit against Trooper Herrnberger in his official capacity. *See* W. VA. CONST. art. VI, § 35.

[68]    *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989);   *cf. Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978) (*respondeat superior* unavailable in § 1983 actions);   U.S. CONST. amend. XI.

13

## IV.    SUMMARY OF THE ARGUMENT

In its analysis of Pegg's Fourth Amendment unlawful arrest claim, the district court erroneously focused exclusively on what Trooper Herrnberger had subjectively arrested Pegg "for" "in practicality":  "While Defendant contends that he had probable cause to arrest Plaintiff *for* a traffic violation pursuant to W. Va. Code § 17C-16-9, in practicality, Plaintiff was arrested [*sic* for] and charged with obstructing a police officer in violation of West Virginia Code § 61-5-17(a) and assault on a police officer, in violation of West Virginia Code § 61-2-10(b)."[69] The district court thus concluded that because Trooper Herrnberger might have arrested Pegg "for" merely questioning Trooper Herrnberger's request for Beever's identification, and because Pegg "had a clearly established Constitutional right to be free from an unlawful arrest for obstructing an officer and assaulting an officer after he merely asked Defendant a question during a routine traffic stop,"[70] then it is "highly possible . . . that Defendant deprived Plaintiff of his Constitutional right to be free from an unreasonable search and seizure."[71]

What a police officer supposedly arrests a plaintiff "for" (regardless of whether "for" is supposed to describe the officer's subjective-real-but-unstated motivation, or the violation that he expressly actually wrote on the citation) does

---

[69]    (JA at 375 (emphasis added).)

[70]    (JA at 375.)

[71]    (JA at 376.)

not matter. The only constitutionally relevant question is whether an objectively reasonable police officer faced with the totality of circumstances that the defendant officer faced could have reasonably concluded that he had probable cause to believe that the plaintiff had committed *any offense*, no matter how minor.

And here, it is undisputed that an objectively reasonable officer could (indeed, would) have concluded that he had probable cause to believe that Brandon Pegg had committed an offense, because Pegg concedes that he violated W. VA. CODE § 17C-16-9. Furthermore, as Trooper Herrnberger demonstrated below, although unnecessary to resolution of Pegg's Fourth Amendment claim (because probable cause to arrest for one offense precludes finding unreasonable an arrest for other offenses), Trooper Herrnberger's attempt to pat Pegg down was lawful— either as a search incident to Pegg's ultimate arrest for violating § 17C-16-9, or under *Terry v. Ohio*, 392 U.S. 1 (1968). Thus, Pegg was *not* free to refuse Trooper Herrnberger's effort to pat Pegg down (here, by physically pulling away from Trooper Herrnberger). So an objectively reasonable officer could have also concluded that he had probable cause to believe that Pegg violated W. VA. CODE § 61-5-17(a) and W. VA. CODE § 61-2-10b(e)—regardless of whether a judicial officer or finder of fact subsequently found otherwise (and especially regardless of whether a prosecuting attorney subsequently dismissed those charges in a misguided effort to avert a civil action). Thus it is not "highly possible"—indeed,

15

it is entirely impossible as a matter of law—that Trooper Herrnberger deprived Pegg of his right to be free from an unreasonable search or seizure.

As for Pegg's First Amendment unlawful arrest claim, the district court wholly failed to address the fact that the Supreme Court of the United States has held that there is *not* a clearly-established First Amendment right to be free from an allegedly retaliatory arrest without proving the absence of probable cause. Because Pegg concedes that Trooper Herrnberger had probable cause to arrest him, Pegg had no clearly-established right to not be arrested—even if some finder of fact might believe that Trooper Herrnberger "really" arrested Pegg "for" expressing himself in the vehicle earlier.

As for Pegg's excessive force claim, the district court incorrectly based its conclusion denying qualified immunity on its perception of Trooper Herrnberger's subjective motivation. The district court wholly failed to analyze the force used by Trooper Herrnberger from the perspective of an objectively reasonable officer. The totality of the circumstances confronting Trooper Herrnberger clearly permitted an objectively reasonable officer to conclude that the force used on Pegg was justified.

Pegg's state-law outrage claim fails because no reasonable finder of fact could possibly conclude that the seconds-long scuffle involved meets the *very* high bar for an outrage claim under West Virginia law. And Pegg's state-law

16

battery claim fails because police officers are privileged to use reasonable force to effectuate a search or an arrest—even if that force would constitute an unwanted touching under any other circumstance.

## V.    ARGUMENT

### A.    The governing standard on appeal.

This Court reviews a district court's denial of qualified immunity *de novo*, construing the facts in the light most favorable to the non-moving party.[72]

### B.    Qualified immunity.

Qualified immunity shields executive officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[73]   The doctrine affords police officers " 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' "[74]   It insulates them from "bad guesses in gray areas," ensuring that they are only liable "for transgressing bright lines."[75]

---

[72]     *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010).

[73]     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[74]     *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[75]     *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).

"This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued."[76] "Where there is a legitimate question as to whether the officer's conduct would objectively violate the plaintiff's right, qualified immunity 'gives police officers the necessary latitude to pursue their [duties] without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law.' "[77] Qualified immunity therefore requires that doubt must be resolved in favor of finding the officer's conduct reasonable: "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful."[78]

As *Harlow* suggests, in analyzing whether a defendant officer is liable to a plaintiff for an alleged constitutional (or other) violation, courts must make two determinations: (1) whether the officer's conduct violated the right that the plaintiff identified, and, if so, (2) whether that right was "clearly established" at the time of that conduct.[79]  Because determining one prong will commonly obviate the

---

[76]    *Hunter*, 502 U.S. at 229.

[77]    *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (alteration in *Slattery*).

[78]    *Id.* (italics in original).

[79]    *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009);  *see also Milstead v. Kibler*, 243 F.3d 157 (4th Cir.), *cert. denied*, 534 U.S. 888 (2001), *abrogated in part on other grounds by Pearson*.

18

need to determine the other, courts may resolve either prong first.[80]  A single, deferent standard requires courts to grant summary judgment to an officer if he objectively reasonably misperceived or misinterpreted the *facts* of his circumstances (and thus did not violate the law under the first prong), or if he objectively reasonably mistakenly believed that his response to those facts was constitutional under then-governing clearly established *law* (and thus is entitled to immunity under the second):

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.  Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, [*Anderson v. Creighton*, 483 U.S. 635 (1987)] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Saucier*, 533 U.S. at 206.[81]

---

[80]    *See Pearson*, 555 U.S. at 236.

[81]    In Fourth Amendment cases, the underlying constitutional standard already incorporates a built-in deference requirement.  In non-Fourth Amendment cases, though, it sometimes will not.  The Court has therefore occasionally added that same highly deferential, objectively-reasonable-room-for-error requirement as a third prong in order to ensure that a courts' reexaminations of an officer's conduct in the first question—Did the officer's conduct violate the identified right?—does not eviscerate the *sine qua non* of qualified immunity: to afford immunity where someone in the officer's position could reasonably, even if mistakenly, believed that his conduct was lawful.  *See, e.g., Milstead.*

As Justice Kennedy wrote in *Groh v. Ramirez*, 540 U.S. 551 (2004) (in a passage later cited in *Pearson*), the first two prongs and their identical, deferent standards, seek to accomplish this one "central question":

> **The central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment.**
>
> An officer might reach such a mistaken conclusion for several reasons. He may be unaware of existing law and how it should be applied. Alternatively, he may misunderstand important facts about [his conduct] and assess the legality of his conduct based on that misunderstanding. Finally, an officer may misunderstand elements of both the facts and the law. Our qualified immunity doctrine applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

540 U.S. at 566–67 (Kennedy, J., dissenting) (emphasis added) (citations omitted).

### C.    Trooper Herrnberger is entitled to qualified immunity from Pegg's Fourth Amendment unlawful arrest claim.

Pegg does not argue that Trooper Herrnberger lacked probable cause to arrest him for violating W. VA. CODE § 17C-16-9. He complains only that the additional § 61-2-10b(e) and § 61-5-17(a) charges lacked probable cause.[82]

---

[82]    Pegg is arguably estopped from re-litigating probable cause on the obstruction charge, because he had a full, fair opportunity to litigate that issue before the magistrate judge, who found that there was probable cause to arrest Pegg for obstruction. *See* 28 U.S.C. § 1738; *Haring v. Prosise*, 462 U.S. 306, 313–15 (1983) (applying state collateral estoppel law to § 1983 claims); syl. pt. 2,

20

Trooper Herrnberger understands Pegg's argument to be that Trooper Herrnberger lacked authority to order Pegg from his vehicle and pat Pegg down,[83] so Pegg was free to resist Trooper Herrnberger's attempt to do so, so Pegg's physical resistance was not obstruction or assault, so his arrest citing in part those charges lacked probable cause, so that arrest was unconstitutional.[84]

Pegg's argument fails for several reasons. First, the two foundation stones on which Pegg builds his argument bear no weight: As Trooper Herrnberger explained in his motion, he *did* have the authority to order Pegg from his vehicle, and he *did* have the authority to pat Pegg down—either incident to Pegg's undeniably lawful arrest for violating W. VA. CODE § 17C-16-9, or given the ample justification presented by the totality of the circumstances under *Terry*. Second, if an objectively reasonable officer could have concluded that he had probable cause to believe that a person committed *any one offense*, then a police officer may arrest that person without violating the Fourth Amendment, even if it

---

*Slider v. State Farm Mut. Auto. Ins. Co.*, 210 W. Va. 476, 557 S.E.2d 883 (2001) (setting out elements of *res judicata*).

[83] (JA at 10 ¶ 9 (calling Trooper Herrnberger's attempt to pat him down "unlawful[]").)

[84] A custodial arrest "by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). *Cf.* W. VA. CODE §§ 61-5-17(a) & 61-2-10b(e) (criminalizing "*unlawfully* commit[ting] an act which places [a] person acting in his . . . official capacity in reasonable apprehension of immediately receiving a violent injury") (emphasis added).

is later held that there was not probable cause to believe that the person violated some, or even any, of the offenses written on the citation.

### 1. Trooper Herrnberger had the authority to order Pegg from his vehicle.

To whatever extent Pegg intended to allege that Trooper Herrnberger's ordering him from his vehicle is part of what justified his physically resisting Trooper Herrnberger's effort to search him,[85] that argument can quickly be rejected:

> We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.

*Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *accord Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (describing *Mimms* as holding "that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle"); *United States v. Stanfield*, 109 F.3d 976, 980 (4th Cir. 1997) (describing *Mimms* as creating "a *per se* rule that drivers may be ordered out of their vehicles during lawful traffic stops, whether or not there exists any particular reason under the circumstances to believe that officer safety might be in jeopardy") (emphasis added).

---

[85]    (JA at 9–10 ¶ 8 (calling being ordered from his vehicle "uppity and disrespectful" also "unreasonable and unlawful").)

## 2. Trooper Herrnberger had the authority to search Pegg incident to Pegg's arrest for his conceded violation of W. VA. CODE § 17C-16-9.

The Fourth Amendment allows a custodial arrest when a police officer has probable cause to believe that a person has violated *any law—even if it is only a minor traffic offense*, and *even if it is one for which state law provides only a fine*: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."[86]   And it is well-settled that a person subject to such arrest is consequently subject to a search of his person:

> It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.  This general exception has historically been formulated into two distinct propositions.  The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest.  The second is that a search may be made of the area within the control of the arrestee.

*United States v. Robinson*, 414 U.S. 218, 224 (1973).

Application of these simple principles here is straightforward:  Pegg admits that he broke the law,[87] so he was subject to arrest[88] and shortly thereafter

---

[86]    *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001);  *see also id.*, 532 U.S. at 323 ("The question is whether the Fourth Amendment forbids a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine.  We hold that it does not.").

[87]    (JA at 9–10 ¶ 8 (admitting to violating W. VA. CODE § 17C-16-9);  *see also supra* at 2 at n.5.)

was arrested.[89]  He was consequently subject to a search of his person (and *a fortiori* to the far less-intrusive pat-down that Trooper Herrnberger tried to do).

This result is true regardless of whether Trooper Herrnberger initially did or did not *intend* to arrest Pegg for violating § 17C-16-9, or initially believed or did not believe that he was searching Pegg incident to that arrest, because what a particular officer subjectively intended is completely irrelevant to the Fourth Amendment analysis.  The Constitution asks only whether an objectively

---

[88]  *See generally Atwater*, *supra*;  *see, e.g.*, *Pepiton v. City of Farrell, Pa.*, No. 05-CV-0573, 2005 WL 2647953, at *3 (W.D. Pa. Oct. 17, 2005) ("Plaintiff alleges that by placing him under arrest, defendant Rococci violated his right to be free from unlawful detention.  Plaintiff's Complaint, however, states he was stopped for driving a motor vehicle with an expired inspection sticker.  The United States Supreme Court has held that the Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine.  As explicitly stated in his Complaint, plaintiff was driving a motor vehicle with an expired inspection sticker, an act which violates [state law], a misdemeanor punishable, upon conviction, to a fine of up to $25.00.  As plaintiff committed a traffic violation in the presence of defendant Rococci, the officer had probable cause to make the arrest, and the arrest was lawful and reasonable under the Fourth Amendment.") (citations omitted).

[89]  *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.");  *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991) ("The Supreme Court has held that where the formal arrest quickly follows the challenged search, it is not important that the search preceded the arrest.");  *see, e.g.*, *United States v. Wen Bin Chen*, 811 F. Supp. 2d 1193, 1204 (M.D.N.C. 2011) ("Chen, of course, was not formally under arrest at the time he was searched.  There is no requirement, however, that a formal arrest take place before the search so long as probable cause to arrest existed at the time of the search.  A search is permissible if it is 'closely related in time to that arrest.' ") (citations omitted).

24

reasonable officer in Trooper Herrnberger's shoes could have believed that the

Fourth Amendment allowed that Pegg was subject to being arrested and searched:

> The probable cause analysis . . . is not limited to only the crime with which Mr. Johnson was charged. The Supreme Court has explained that an officer's "subjective reason for mak[ing] the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004). Rather, the objective analysis required by the Fourth Amendment under which " 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (quoting [*Whren v. United States*, 517 U.S. 806 (1996)]). Accordingly, courts have concluded that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that ***it is not relevant whether probable cause existed with respect to each individual charge***, or, indeed, ***any charge actually invoked by the arresting officer at the time of the arrest***." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006); *see also Abbott v. Sangamon [County], Ill.,* 705 F.3d 706, 715 (7th Cir. 2013) ("[A]n arrest can be supported by probable cause that the arrestee committed any crime, ***regardless of the officer's belief as to which crime was at issue***. . . ."); *United States v. McNeill,* 484 F.3d 301, 311 (4th Cir. 2007) ("[T]he arrest is valid if, based on the facts known to the officer, objective probable cause existed as to *any* crime.") . . . .

*Johnson v. City of Fayetteville*, No. 5:12-CV-456-F, 2015 WL 928772, at *17

(E.D.N.C. Mar. 4, 2015) (final emphasis in original) (parallel citations omitted).

Pegg states that "[a]t no time during any of the events alleged herein had [he] engaged in any unlawful conduct or committed any offense for which he could have been subjected to an arrest, warrantless or otherwise."[90]   This is irrelevant (and incorrect).  It is irrelevant because the Fourth Amendment does not draw any distinction "between 'jailable' and 'fine-only' offenses,"[91] but instead asks only whether the person violated *any law*.[92]

Pegg admits that Trooper Herrnberger saw him break the law.  He was therefore subject to custodial arrest and, consequently, to being searched.  Accordingly, Trooper Herrnberger was authorized to search Pegg.  Pegg was thus not free to resist that search, an objectively reasonable officer could have believed that Pegg's forceful resistance by twisting and pulling away from Trooper Herrnberger *was* state-law obstruction and assault, so Trooper Herrnberger's arrest

---

[90]    (JA at 10 ¶ 12.)

[91]    *Awater*, 532 U.S. at 348.

[92]    It is incorrect because even if state law governed the analysis—and it does not, *see Atwater*, *supra*; *Cooper v. California*, 386 U.S. 58, 61 (1967);  *Gregory v. Burnett*, 577 F. App'x 512, 517 (6th Cir. 2014);  *United States v. Walker*, 960 F.2d 409, 415–16 (5th Cir. 1992))—Pegg has conflated "jailable" with "arrestable." Regardless of whether he was jailable for violating W. VA. CODE § 17C-16-9, he was undeniably arrestable for the crime.  *See* W. VA. CODE § 15-2-12(b)(1) (empowering troopers to arrest "any persons charged with the violation of *any law of this state* . . . *and when a witness to the perpetration of any offense or crime, or to the violation of any law of this state* . . . *to make arrests without warrant*") (emphasis added);  syl. pt. 3, *State v. Olivetti*, 107 W. Va. 357, 148 S.E. 205 (1929).

of Pegg was *not* an unreasonable seizure.  Pegg's unlawful arrest claim based on the Fourth Amendment lacks merit.

### 3.    Trooper Herrnberger had the authority to pat Pegg down under *Terry*.

Although he did not need any further justification to pat Pegg down, Trooper Herrnberger also had the authority to pat Pegg down under *Terry*.  A police officer may pat a person down when he reasonably suspects that the person "is armed and presently dangerous to the officer or to others . . . ."[93]  *Terry*'s reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."[94]  It is "a commonsensical proposition," and "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."[95]  Moreover, "[t]he reasonable suspicion standard is an objective one, and *the officer's subjective state of mind is not considered*."[96]

---

[93]    *Terry*, 392 U.S. at 24.

[94]    *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[95]    *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

[96]    *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (emphasis added).

Trooper Herrnberger testified that the following facts were, based on his experience—not just as a State Trooper but as one involved in successful drug interdictions[97]—suspicious and commonly associated with criminal activity:

The Troopers believed that from the outset of their first encounter with him, Pegg was attempting to elude them. Specifically, they felt that under the circumstances—*i.e.*, that his window was rolled down, and that he was travelling slowly on the small country road—Pegg *had* heard their initial instruction that he stop for the inspection sticker violation. Thus, his failure to do so was, they concluded, an intentional refusal to do so.[98] They also testified that it took them longer to catch up to Pegg than it would have had he not been trying to put distance between himself and the officers after initially not stopping. And they were behind Pegg for *forty-five seconds* with their marked West Virginia State Police cruiser's blue lights on. Even without using their siren, their belief that Pegg saw them and was refusing to pull over can hardly be criticized.[99]

---

[97]    (JA at 23.)

[98]    *See, e.g.*, *Wardlow*, 528 U.S. at 125 (recognizing "that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity" but this fact "does not establish a violation of the Fourth Amendment"). As noted, Pegg denies that he *heard* this, but he does not deny that it happened. (*See infra* at 33 n.105.)

[99]    *See, e.g.*, *Britt v. Peoria County*, No. 11-1034, 2013 WL 474377, at *4 (C.D. Ill. Feb. 7, 2013) ("failure to pull over for approximately 15 seconds after he activated his emergency lights" contributed to the officer's finding of reasonable suspicion); *United States v. Walker*, 555 F.3d 716, 720 (8th Cir. 2009) (fact that

Pegg's vehicle bore a life-size representation of an AR15 assault rifle and the challenge, "Come and take it." Trooper Herrnberger was entitled to believe that the driver of such a vehicle has "it" to "come and take"—*i.e.*, that he is presently armed and dangerous.

Trooper Herrnberger testified that in his experience with traffic stops, it is suspicious for the passenger of a vehicle to be so nervous in response to simply being spoken to by a police officer that his lip begins to quiver,[100] and that it is suspicious for the passenger of a vehicle to not know—or, as far as Trooper Herrnberger knew, to refuse to say—where he is going.[101]

---

"Walker failed to pull over immediately after [officer] Ungurian activated his lights" contributed to reasonable suspicion); *Argueta v. City of Revere*, No. 09-CV-10268, 2009 WL 5218073, at *2 (D. Mass. Dec. 31, 2009) (granting defendants summary judgment, finding that fact that plaintiff "failed to stop when the police, with blue lights flashing, signaled him to pull over" contributed to objectively reasonable suspicion of past or present wrongdoing); *United States v. Oliver*, 550 F.3d 734, 738–39 (8th Cir. 2008) (finding pat-down search of vehicle's passenger, Oliver, was based on reasonable suspicion in part because "the vehicle had failed to stop upon Engum's activation of his emergency lights; . . . the hands of the vehicle's driver were visibly shaking . . . ; [Oliver] was fidgeting with the front pocket of his hooded sweatshirt, which appeared to be concealing something; and [Oliver's] body language was such that it made the hair on the back of Engum's neck stand") (scattered alterations in original).

[100]    *See, e.g.*, *Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Vaughan*, 700 F.3d 705, 711 (4th Cir. 2012) (the court "has pointed to such behavior as contributing to reasonable suspicion in the context of traffic stops").

[101]    *See, e.g.*, *United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) ("the court has found vague, inconsistent or evasive answers with respect to travel

Trooper Herrnberger testified that in his experience, it is unusual for the driver of a car to interfere with a police officer's investigation of the passenger by demanding that the officer give the driver the officer's reason for asking the passenger for his identification.

Trooper Herrnberger and Pegg's passenger, Beever, both testified that Pegg became agitated when Trooper Herrnberger advised Pegg to stop interfering with Trooper Herrnberger's investigation.

And finally, Trooper Herrnberger testified that he saw Pegg reach for an unknown dark object between his legs. Pegg disputes only that he actually did reach for anything (*but see infra*). Nonetheless, even without that one fact, it is clear that the totality of the circumstances on August 4, 2013, would have given any objectively reasonable officer adequate reasonable suspicion to pat Pegg down.

During the depositions in this case, Pegg explored at length various ostensibly innocent explanations for some of the circumstances that made up the totality of circumstances supporting the constitutionality of the decision to search Pegg. But *none* of that matters, because the Fourth Amendment does not require a

---

plans supportive of reasonable suspicion"); *United States v. Toranzo*, No. 207-CR-38, 2007 WL 1341048, at *4 (N.D. Ind. May 4, 2007) ("[a]lso suspicious were Defendant's ignorance as to where specifically he was going and his failure to explain why he did not know where he was going") (footnote omitted); *United States v. Brown*, 21 F.3d 425 (4th Cir. 1994) (mem.) (fact that passenger told "the officer that he did not know where they were going" contributed to reasonable suspicion).

police officer to be correct; it only requires his inferences to be reasonable. And Pegg offers no evidence that an officer facing Trooper Herrnberger's circumstances could not reasonably have believed what Trooper Herrnberger believed—even if, it ultimately turns out, incorrectly.

For example, Pegg asserts that some of his acts were lawful. Of course they were; that's the entire point of suspiciousness jurisprudence: Did the totality of otherwise lawful circumstances give rise to a certain level of suspicion about the actor?[102] After all, if an officer witnessed a person engage in *unlawful* conduct, then there would be no need for any "totality" analysis, because an officer who witnesses someone do something unlawful unquestionably has probable cause

---

[102] *See United States v. Arvizu*, 534 U.S. 266, 274, 277–78 (2002) ("The court appeared to believe that each observation by Stoddard that was by itself readily susceptible to an innocent explanation was entitled to 'no weight.' *Terry*, however, precludes this sort of divide-and-conquer analysis. . . . A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for Stoddard's stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment."); *Terry*, 392 U.S. at 22–23 (noting that it is the constellation of independently lawful acts that gives rise to reasonable suspicion of criminal activity afoot and finding reasonably suspiciois that "a series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation."); *United States v. Sokolow*, 490 U.S. 1, 9–10 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (noting that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot").

to believe that the person has done something unlawful, and can arrest him. That fact pattern would never give rise to a lawsuit.[103]

Pegg claims to have not heard the Troopers' initial instruction to pull over. Even ignoring his own testimony admitting that he heard the Troopers say something to him and that he "thinks" it was "[s]omething about [his] inspection sticker,"[104] the Court can assume *arguendo* that this is true. It changes nothing, because Pegg offered nothing to dispute the fact that one of the Troopers did call

---

[103]    Pegg's AR15 sticker, for example, might have been perfectly legal. But that did not preclude Pegg's displaying it from "raising the hair on the back" of Trooper Herrnberger's neck in a constutionally significant way. In *George v. Rehiel*, 738 F.3d 562 (3d Cir. 2013), for example, George "was detained, interrogated, handcuffed, and then jailed, in violation of his Fourth and First Amendment rights, because he was carrying a deck of Arabic-English flashcards and a book critical of American interventionism." *Id.* at 566. Vacating the district court's order denying the officers qualified immunity, the Third Circuit said: "It is beyond dispute that the First Amendment protects George's right to possess, read and study the flashcards and the book he was carrying. . . . However, the fact that George had a First Amendment right to possess, read and study the materials he possessed does not end the inquiry. The fact that George clearly had a right to have these flash cards, does not mean that TSA Officials had to ignore their content or refrain from investigating him further because of the words they contained. The totality of circumstances here could cause a reasonable person to believe that the items George was carrying raised the possibility that he might pose a threat to airline security. That suspicion was the reason for their increased level of scrutiny during the airport screening. The TSA Officials' suspicion was an obvious alternative explanation for their conduct, which negates any inference of retaliation." *Id.* at 585–86.

[104]    (JA at 98 ("Q: Can you please tell me when they [first] addressed you. A: When I was driving by, and *I heard them yell something*. . . . Q: And what did they yell when you drove by? A: I—I don't really recall. *Q: Something about your inspection sticker? A: I—I think*, but I don't . . . .") (emphasis added).)

out to him,[105] that he was driving slowly, and that his window was rolled down. Under the circumstances, it was therefore perfectly reasonable for Trooper Herrnberger to believe that Pegg had heard the instruction to stop and that Pegg's failure to do so was an intentional refusal to stop. As noted, flight from the police contributes to the objective reasonableness of Trooper Herrnberger's belief.

Relatedly, Pegg says that after not pulling over in response to the Troopers' initial instruction to do so, he did not then attempt to elude them before they caught back up to him. Assuming *arguendo* that that is true, Pegg nevertheless cannot argue that under the circumstances it was objectively unreasonable for Trooper Herrnberger to believe that it took longer to catch back up to Pegg than it would have had he not been trying to put space between himself and the Troopers, and eluding is classically suspicious.

Pegg said that he did not see the Troopers' blue lights during the *forty-five seconds* that they were behind him, and that he pulled over as soon as he possibly could after he did see them. For the same reason as Pegg's assertion that he did not hear the Troopers' initial oral instruction to stop, this, too, is completely irrelevant, because it is undisputed that the Troopers *had* been following immediately behind Pegg for forty-five seconds before he finally pulled over, and it is objectively reasonable to believe that a person who fails to stop after being

---

[105]    (*See*, *e.g*., JA at 106 ("Q: Can you be sure that they [Troopers Beck and Herrnberger] did not call out towards the Jeep?  A: No.").)

followed for that long by a marked West Virginia State Police cruiser with flashing blue lights is refusing to stop for some culpable reason.

Pegg said that Beever really didn't know where he and Pegg were going, because they were just aimlessly driving to a place where a friend's house used to be because it was "[s]omewhere to go" in an effort to put Pegg's daughter (who was in the back seat) to sleep.[106]  Even if true, that does not change the fact that Beever's answer to Trooper Herrnberger's question was nonetheless highly unusual.  Not only is it unusual for a passenger to not know where his driver is taking him, but Beever could have quickly and easily explained why he supposedly did not know where they were going, yet he made no effort to do so, instead giving only the terse response, "I don't know;  he's driving."[107]  An objectively reasonable officer would have found Beever's answer quite suspicious.

Pegg will say that he did not reach for anything between his legs.[108] Even if Pegg were to argue that he has evidence that Herrnberger did not believe

---

[106]      (*See, e.g,* JA at 74, 77.)

[107]      (*See also* JA at 107 ("Q: Do you recall telling him anything else?  A: No.").)

[108]      Plaintiff's position on whether he reached between his legs is hypersemantic and unsupported by the clear video of exactly what happened.  (*See* JA at 102 (Resp. to Def.'s RFA #3) ("**Request**: . . . [A]dmit that while Trooper Herrnberger was speaking with your adult passenger, you began reaching between your legs. **Response**:  Denied to the extent that Plaintiff was doing anything other than handling his wallet (located in his crotch area) from which he had just extracted his license at Trooper Beck's request.  Plaintiff was not 'reaching between his

that he saw Pegg reaching between his legs—a dubious argument—the result remains the same, because even without this act, the remaining circumstances gave Herrnberger ample suspicion to attempt to conduct a *Terry* frisk.

Pegg's *post hoc* explanations change nothing:

> [T]he mere fact that particular conduct may be susceptible of an innocent explanation does not establish a lack of reasonable suspicion. The Supreme Court has consistently rejected the notion that courts can second-guess police officers by speculating on possible innocent reasons for a defendant's actions. It has likewise prohibited courts from engaging in the sort of "divide-and-conquer analysis" that treats each action by a defendant in isolation, finds each of them to be possibly innocent, and thus picks apart an officer's reasonable assessments. Officers, in other words, are not required to rule out all possibility of innocent conduct or to wait until criminal activity actually occurs before responding to a suspicious set of circumstances.

*United States v. Perkins*, 363 F.3d 317, 327 (4th Cir. 2004) (citations omitted).

"It is the entire mosaic that counts, not single tiles,"[109] and a *Terry* stop and frisk cannot be found "unjustified based merely on a piecemeal refutation of each individual fact and inference."[110]  Here, the "entire mosaic" of circumstances before Brandon Pegg's brief frisk (or at least what would have been

---

legs.' ");  JA at 36 ("And at that the [*sic*] point, I see him reaching between his legs.");  JA at 108 (Pegg's wallet was between his legs).)

[109]    *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir. 1988), *abrogated on other grounds*, *Gozlon-Peretz v. United States*, 498 U.S. 395 (1991).

[110]    *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (internal quotation marks omitted).

had he cooperated) would have given any objectively reasonable police officer a reasonable suspicion that criminal activity was afoot.

### 4.    Summary.

The district court erroneously focused exclusively on what it believed Trooper Herrnberger arrested Pegg "for."   Because, the court concluded, it is "highly possible" that Trooper Herrnberger arrested Pegg not "for" Pegg's physically pulling away from a lawful search (as recorded in the charging instruments) but instead "for" questioning Trooper Herrnberger's investigation of Robert Beever, and because such mere protestations did not constitute state-law obstruction (an irrelevant point that Trooper Herrnberger does not dispute), Pegg's arrest "for" questioning Trooper Herrnberger's investigation of Beever lacked probable cause and was therefore an unconstitutional, seizure.

Ignoring the fact that the district court analyzed an arrest that simply never happened, as detailed herein, Trooper Herrnberger's subjective motivation in arresting Pegg "for" anything (and searching Pegg "for" some reason) is wholly irrelevant to the proper analysis of his Fourth Amendment claim.

"The touchstone of . . . analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' "[111]  "Reasonableness, of course, depends

---

[111]    *Mimms*, 434 U.S. at 108–09 (citation omitted).

'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' "[112]  And regardless of the governing standard, throughout his encounter with Mr. Pegg, Trooper Herrnberger's conduct struck a textbook reasonable balance between the public interest—*i.e.*, enforcement of the law and the safety of everyone involved—and Pegg's private interest—*i.e.*, what would have been a brief pat down.

Trooper Herrnberger's ordering Pegg from his vehicle was undeniably constitutional.  And Pegg concedes that he was breaking the law.  He was, as a result, arrestable without offending the Fourth Amendment, regardless of any other charges or subjective motivation that he might have been arrested "for."

Consequently, Pegg was also searchable—both incident to his moments-later arrest, and under *Terry* given the totality of the circumstances confronting Trooper Herrnberger.  Thus, Trooper Herrnberger's attempt to pat Pegg down was perfectly reasonable (and thus independently constitutional);  Pegg was *not* free to physically resist Trooper Herrnberger;  and an objectively reasonable officer could have concluded that Pegg's physical resistance was both obstruction and assault on a police officer.

Accordingly, Pegg's arrest was not an unreasonable seizure.  But even if Pegg's arrest is found in retrospect to have been unreasonable, an objectively

---

[112]    *Id.* at 109.

reasonable officer could have believed that Trooper Herrnberger's conduct was constitutional. Trooper Herrnberger is thus entitled to qualified immunity.

### D. Trooper Herrnberger is entitled to qualified immunity from Pegg's First Amendment unlawful arrest claim.

Pegg alleges that his search and seizure (*i.e.*, what was going to be a pat down, before he resisted, and his subsequent arrest) were in "retaliation" for having demanded to know why Trooper Herrnberger wanted Beever's identification. Pegg does not, however, allege that Trooper Herrnberger lacked *any* probable cause to arrest Pegg. As already discussed, it is undisputed that Trooper Herrnberger *had* probable cause to arrest Pegg.[113] That fact is fatal to Pegg's First Amendment unlawful arrest claim.

In *Reichle v. Howards*, 132 S. Ct. 2088 (2012), the Supreme Court addressed "whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest . . . ."[114] Noting that it "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause,"[115] the Court held that no such right is clearly established. Since then, neither the Supreme Court nor this Court has established a

---

[113]    Again, it is immaterial that Trooper Herrnberger might not have initially *intended* to arrest Pegg for violating W. VA. CODE § 17C-16-9; the fact that he could have is all that matters.

[114]    132 S. Ct. at 2093.

[115]    *Id.*

First Amendment retaliatory seizure claim absent lack of probable cause. After *Reichle* and before Pegg's arrest, this Court held that the only reason one plaintiff's retaliatory arrest claim survived *dismissal* was that he *had* alleged want of probable cause.[116] Without explicitly holding so, *Tobey* could hardly more strongly suggest that want of probable cause is an element of a retaliation claim.

So first, then, Trooper Herrnberger did not violate Pegg's First Amendment right, because Pegg has not alleged the total absence of—and admits the presence of—probable cause to arrest him (for violating, at least, W. VA. CODE § 17C-16-9), and no controlling court has ever established a retaliation claim in the presence of probable cause.[117] Second, even if that were not true, on August 4, 2013, it was (and remains today) *not* clearly established that there is a cause of action for a First Amendment retaliatory arrest claim despite the presence of

---

[116]  *Tobey v. Jones*, 706 F.3d 379, 392 (4th Cir. 2013) ("*Reichle* does not apply here because Mr. Tobey specifically alleges that his arrest was *not* supported by probable cause . . . .") (emphasis in original).

[117]  *See, e.g.*, *Keaton v. Hannum*, No. 1:12-CV-00641, 2014 WL 941352, at *14 (S.D. Ind. Mar. 11, 2014) ("If probable cause exists, the [officer's] motives are irrelevant. The Supreme Court has stated that a police officer's motive does not invalidate 'objectively justifiable behavior under the Fourth Amendment.' '[S]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional.' . . . 'Probable cause, if not a complete bar to [a] First Amendment retaliatory arrest claim, provides strong evidence that he would have been arrested regardless of any illegitimate animus.' For the reasons explained above, Hannum reasonably believed that there was probable cause for Keaton's arrest. Thus, he is entitled to qualified immunity on this basis and summary judgment is entered in favor of Hannum on this claim.") (citations omitted) (scattered alterations in original).

39

probable cause. "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."[118]

### E. Trooper Herrnberger is entitled to qualified immunity from Pegg's Fourth Amendment excessive force claim.

The Fourth Amendment requires that a police officer's use of force be "objectively reasonable" in light of the facts and circumstances confronting him:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. The calculus of

---

[118]    *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

> reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second
> judgments—in circumstances that are tense, uncertain,
> and rapidly evolving—about the amount of force that is
> necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (emphasis added) (citations omitted).[119]

In assessing whether an officer's conduct was objectively reasonable given the circumstances confronting him, courts acknowledge that real police officers do not work in the calm of a courtroom. Instead, they work at the sharp point of law enforcement and thus often face dangerous, volatile situations that arise quickly and evolve rapidly, requiring them to sense and process a great deal of dynamic information and make critical decisions about, *inter alia*, the use of force, commonly with results that can be most unforgiving:

> The calculus of reasonableness must embody allowances
> for the fact that police officers are often forced to make
> split-second judgments—in circumstances that are tense,
> uncertain and rapidly evolving—about the amount of
> force that is necessary in a particular situation.

---

[119]    *See also Scott v. Harris*, 550 U.S. 372, 381 (2007); *Vathekan v. Prince George's County, Md.*, 154 F.3d 173, 178 (4th Cir. 1998) ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.") (quoting *Graham*, 490 U.S. at 395) (alteration in *Vathekan*) (internal quotation marks omitted).

*Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir. 2001) (citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (quoting *Graham*).

Because "officers on the beat are not often afforded the luxury of armchair reflection,"[120] courts recognize "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests . . . ."[121] Thus, "[t]he requirement of reasonableness does not . . . demand statistical precision: it accords police officers 'latitude in exercising what are inescapably discretionary functions replete with close judgment calls.' "[122] Rather, "reasonableness is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight."[123]

Here, Pegg initially committed a minor offense. But as explained earlier, an objectively reasonable police officer facing the same circumstances could easily have believed that more was going on and that Pegg presented a threat. So Trooper Herrnberger attempted to subject Pegg to what would have

---

[120] *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996), *reh'g en banc denied*, 105 F.3d 174 (4th Cir.), *cert. denied*, 521 U.S. 1120 (1997).

[121] *Maryland v. Garrison*, 480 U.S. 79, 87 (1987).

[122] *Abney*, 493 F.3d at 415–16 (quoting *Gooden v. Howard County, Md.*, 954 F.2d 960, 964 (4th Cir. 1992) (en banc)).

[123] *Id.* (citations omitted); *accord Park*, 250 F.3d at 853 ("The outcome of that test depends on all of the circumstances of the case as they existed at the time of the incident from the perspective of a reasonable police officer, not with 20/20 hindsight at the time of th[e] trial.") (quotations omitted). *See also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.), *cert. denied*, 132 S. Ct. 781 (2011).

42

been a very minor intrusion (a *Terry*-type pat down). Pegg admits, however, that *he resisted Trooper Herrnberger efforts*, and it is clear from the video that he did.[124] So Trooper Herrnberger placed Pegg on the ground just long enough to secure his compliance and handcuff him, and Pegg stood back up.[125] Notwithstanding Pegg's histrionic allegation that Trooper Herrnberger used "brutal force,"[126] Pegg admits that as a result of his resistance, in the few seconds that he spent on the ground, "[t]he extent of the his injury"[127] was two scrapes to his forehead that he self-treated with household medicine-chest remedies.[128]

In its analysis of what force would have been reasonable and what force was applied, the district court correctly noted that the standard is wholly one of "objective reasonableness."[129] But then the court immediately relied on what it felt Trooper Herrnberger's subjective motivation might have been.[130] As the very

---

[124]    (*See, e.g.*, JA at 103 (Pl.'s Resp. to Def.'s RFA #6) ("**Request**: Admit that you resisted Trooper Herrnberger's attempt to secure your hands behind your back. **Response:** Admitted."); *accord* JA at 20, 45–47, 49–50, 70, 131–33; *see supra* at 34 n.108.)

[125]    (*See also* JA at 89 (officers did not punch, kick, or yell obscenities at Pegg).)

[126]    (JA at 13 ¶ 25.)

[127]    *See Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

[128]    (JA at 93 (conceding that he treated his scrapes with "[p]eroxide and Neosporin"); *see also* JA at 95 (received no medical care).)

[129]    (JA at 379.)

[130]    (*See, e.g.*, JA at 380 ("First, this Court finds it compelling that even before the encounter took place, Defendant whispers, 'Run! Run!', and 'That would be awesome!' Defendant, in so exclaiming, does not appear to behave as a reasonable

43

phrase "objective reasonableness" makes clear, however, whatever did or did not subjectively "motivate" Trooper Herrnberger is, as a matter of law, of no moment whatsoever in determining whether his response to Pegg's resistance violated the Fourth Amendment:

> As in other Fourth Amendment contexts, . . . the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Graham*, 490 U.S. at 397 (citations omitted).[131]

"To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances."[132] Any conjectured *subjective* intent or motivation of the defendant officer is wholly irrelevant:

> Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case.
>
> Though it focuses on the objective facts, the immunity inquiry must be filtered through the lens of the

---

officer at the outset, and instead seems to this Court to potentially be pre-disposed to using force to arrest Plaintiff.").)

[131] *Accord Terry*, 392 U.S. at 21 ("it is imperative that the facts be judged against an objective standard").

[132] *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994).

officer's perceptions at the time of the incident in question. Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are.

*Rowland*, 41 F.3d at 173 (citation omitted). Indeed, even "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ."[133]

Ultimately, the district court did no analysis of what force would have been objectively reasonable under the circumstances, and simply said, in a single sentence, that "a reasonable jury could view that video and find that Defendant did not behave as a reasonable officer would under the circumstances, and that he used excessive force."[134] With all due respect, such a terse conclusion—lacking any discussion of "the actions at issue" or "what a reasonable police officer would do under the circumstances"—is a wholly inadequate basis to deny Trooper Herrnberger qualified immunity.

---

[133]    *Graham*, 490 U.S. at 397.

[134]    (JA at 380.)

45

The *totality* of the circumstances confronting Trooper Herrnberger, detailed *supra*, the video, and the objective fact that Pegg concedes that he received the most minor harm that might still imaginably even qualify to be called an "injury" compel the conclusion that Trooper Herrnberger could hardly have used less force and still have secured Pegg's compliance. Under the undisputed circumstances, Trooper Herrnberger's conduct was paradigmatically reasonable, and Pegg's excessive force claim lacks merit.[135] At a minimum, even if found in retrospect to be constitutionally excessive, Trooper Herrnberger's conduct violated no clearly established rights, entitling him to qualified immunity.

**F.    Trooper Herrnberger is entitled to qualified immunity from Pegg's state-law outrage claim.**

With irrelevant exceptions, West Virginia law affords the same discretion to state police officers to be reasonably mistaken about the facts and the law that federal law does, *i.e.*:  "qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known."[136]

---

[135]    *See, e.g.*, *Miller v. Parrish*, No. 3:12-CV-873, 2013 WL 1868028, at *8 (E.D. Va. May 2, 2013) (granting summary judgment to officer on excessive force claim where plaintiff was stopped for, *inter alia*, an expired inspection sticker and refused to submit to the officer's commands (by grabbing the steering wheel and not letting go), and where there was "no evidence of any serious or lasting injuries . . . , only minor bumps and bruises" and calling the force applied "relatively *de minimis* and certainly not excessive").

[136]    *State v. Chase Sec., Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992).

Pegg claims that Trooper Herrnberger "bullied" him, and he parrots the elements of a West Virginia common-law claim for outrage.[137]  In order to prevail on his third claim, Pegg must prove:

(1)    that Trooper Herrnberger's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency;

(2)    that Trooper Herrnberger acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct;

(3)    that Trooper Herrnberger's actions caused Pegg to suffer emotional distress;  and

(4)    that the emotional distress that Pegg suffered was so severe that no reasonable person could be expected to endure it.

*See* syl. pt. 3, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998).[138]

The first *Travis* element requires conduct that is " 'more than unreasonable, unkind or unfair . . . .' "[139]  In *Tanner v. Rite Aid of W. Va., Inc.*, 194 W. Va. 643, 461 S.E.2d 149 (1995), the West Virginia Supreme Court discussed the very high threshold for an outrage claim:

---

[137]    (JA at 14 ¶ 28.)

[138]    *Cf.* syl. pt. 6, *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 289 S.E.2d 692 (1982).

[139]    *Travis*, 202 W. Va. at 375, 504 S.E.2d at 425).

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

194 W. Va. at 650, 461 S.E.2d at 156 (emphasis added) (quoting RESTATEMENT (SECOND) TORTS § 46 cmt. d). The burden of proving outrage is "a high standard indeed."[140] Dismissal of Pegg's third claim is especially appropriate because determination of what conduct reasonably may be called "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency" is for the courts as gatekeeper.[141]

As detailed above—and as the relevant forty seconds of the Video clearly demonstrate—Trooper Herrnberger's interaction with Pegg was calm and professional. Pegg concedes that Herrnberger did not punch or kick him, or even

---

[140]    *Keyes v. Keyes*, 182 W. Va. 802, 805, 392 S.E.2d 693, 696 (1990) (citation omitted); *id.* (calling outrage "a slippery beast, which can easily get out of hand without firm judicial oversight").

[141]    *See* syl pt. 4, *Travis*.

shout at him. Trooper Herrnberger simply took Pegg to the ground, handcuffed him, and stood him back up. That hardly rises to the level required to make out a clearly-established claim of outrage. Trooper Herrnberger is thus entitled to qualified immunity from Pegg's third claim.

### G. Trooper Herrnberger is entitled to qualified immunity from Pegg's state-law battery claim.

Police officers are privileged to use reasonable force to effectuate a search or arrest.[142] As demonstrated, Trooper Herrnberger used reasonable force to effectuate Pegg's frisk and arrest. To whatever extent it might turn out that he was mistaken about the circumstances justifying his acts, an objectively reasonable police officer in his shoes could easily have been likewise mistaken, so Trooper Herrnberger is at least entitled to qualified immunity from Pegg's battery claim.

## VI.    CONCLUSION

Qualified immunity "ensures that, when the legality of a particular course of action is open to reasonable dispute, an officer will not be subjected to

---

[142]    *See, e.g.*, *Lawyer v. City of Council Bluffs, Iowa*, 240 F. Supp. 2d 941, 955 (S.D. Iowa 2002) ("Further, a police officer is not liable for assault and battery in connection with a use of force he or she is statutorily authorized to employ. 'Police officers are privileged to commit a battery pursuant to a lawful arrest' subject to the limitation on excessive force."), *aff'd*, 361 F.3d 1099 (8th Cir. 2004); *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) ("Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force."); RESTATEMENT (SECOND) TORTS §§ 118 and 132.

trial and liability."[143]  "The purpose of the immunity is to allow some room for discretionary judgment in what are indisputably difficult circumstances and not to have the prospect of being blind-sided in hindsight discourage officers from the constructive tasks they can in fact perform."[144]  Trooper Herrnberger was neither "plainly incompetent" nor one "who knowingly violated the law."[145]  At the very worst, his response to the circumstances was "open to reasonable dispute."

Accordingly, Trooper Herrnberger respectfully requests that the Court **GRANT** his appeal and **ORDER** that the Order of the District Court for the Southern District of West Virginia denying Trooper Herrnberger's motion for summary judgment be **REVERSED** with instructions to enter summary judgment in Trooper Herrnberger's favor.

**APPELLANT,**

**By Counsel**

/s/Deva A. Solomon

Monté L. Williams (WV Bar #9526)
Deva A. Solomon (WV Bar #10843)
Robert Bailey (*on brief*) (WV Bar #8902)
**STEPTOE & JOHNSON PLLC**
*Of Counsel*
STEPTOE & JOHNSON PLLC
P.O. BOX 1616
MORGANTOWN, W. VA. 26507 1616
Phone:      (304) 598-8000
Facsimile:   (304) 598-8116

---

[143]    *Figg v. Schroeder*, 312 F.3d 625, 636 (4th Cir. 2002).

[144]    *Melgar ex rel. Melgar*, 593 F.3d at 357.

[145]    *Hunter*, 502 U.S. at 229 (quoting *Malley*, 475 U.S. at 341).

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,474*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: October 26, 2015            /s/ Deva A. Solomon
                                    *Counsel for Appellant*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 26th day of October, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

| | |
|---|---|
| Paul J. Harris | Robert G. McCoid |
| HARRIS LAW OFFICES | MCCAMIC, SACCO, PIZZUTI & |
| 15th & Eoff Streets | MCCOID, PLLC |
| Wheeling, West Virginia  26003 | 56-58 14th Street |
| (304) 232-5300 | Post Office Box 151 |
| | Wheeling, West Virginia  26003 |
| | (304) 232-6750 |
| | |
| *Counsel for Appellee* | *Counsel for Appellee* |

I further certify that on this 26th day of October, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Deva A. Solomon
*Counsel for Appellant*